**UNITED STATES of America, Appellee,**

v.

**Gordon John STOVER, Appellant.**

**No. 77–1288.**

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 29, 1977.

Decided Nov. 10, 1977.

---

Philip M. Moomaw, Asst. Federal Public Defender, Springfield, Mo., (argued), for appellant; David R. Freeman, Federal Public Defender, Springfield, Mo., on brief.

David H. Jones, Asst. U. S. Atty., Springfield, Mo., (argued), for appellee; Bert C. Hurn (former U. S. Atty.), Springfield, Mo., on brief.

Before GIBSON, Chief Judge, LAY and HEANEY, Circuit Judges.

GIBSON, Chief Judge.

Defendant Gordon John Stover was convicted by a jury of one count of transporting a vehicle in interstate commerce, knowing the vehicle to have been stolen, in violation of 18 U.S.C. § 2312. On April 4, 1977, the District Court[1] sentenced Stover to a four-year term of imprisonment. On April 7, 1977, the District Court entered a *nunc pro tunc* order modifying the order of commitment to show that this four-year sentence was to be served consecutively with another federal sentence defendant was then serving. Stover appeals.

Lamar, Missouri, is a small town with a population of approximately 3,600 located in southern Missouri. During the early morning hours of July 22, 1976, Officer Robert Wineinger of the Lamar Police Department discovered a 1970 Chevrolet with Minnesota license plates parked in a somewhat remote area of Lamar. A computer check revealed that the 1970 Chevrolet had been reported stolen from St. Croix, Minnesota, on July 16, 1976.

At approximately 7:30 on the morning of July 22, 1976, Kenneth Musgrove, who serves as pastor of the Full Gospel Tabernacle in Lamar, saw a person leaving his church. A called proffer of help from Musgrove was rejected by the person, who continued to walk away. Musgrove then checked inside the church and, while he found nothing missing, did discover that clothing in one of the missionary rooms had been arranged into a sort of pallet and apparently slept upon. Musgrove reported what he had seen to the Lamar police, describing the person he had encountered leaving the church as a "boy" of small stature, wearing a light jacket and a cap of some kind.

When Officer Richard Burch of the Lamar Police Department went on duty on the afternoon of July 22, he was given the above description and told where it originated. He was also instructed that if he found an individual matching this description, he was to make an arrest for investigation of automobile theft. At 2:00 p. m., Officer Burch found a person matching the description given by Musgrove walking down a highway at a point approximately one-half mile from the church. Burch immediately arrested this person, who was later identified as defendant Stover, for investigation of automobile theft.

Officer Burch took Stover, who carried no identification, to the Barton County Jail. Upon his arrival at the jail, Stover was questioned by FBI Agent Funderburke, who had come to Lamar to investigate the 1970 Minnesota Chevrolet discovered earlier. As part of this investigation, Agent Funderburke took fingerprint lifts from the Chevrolet. Stover gave a false name to Funderburke, who took his fingerprints. Stover was also fingerprinted by the Lamar Police Department.

The fingerprints taken at the Barton County Jail by Agent Funderburke on July 22 were sent to the Identification Division of the FBI in Washington, D.C., where they were identified as those of Gordon John Stover. The latent fingerprints lifted from the 1970 Chevrolet were also identified as those of Stover. Stover was subsequently surrendered to federal custody, indicted and convicted of interstate transportation of the 1970 Chevrolet.

---

1. The Honorable William R. Collinson, United States District Judge for the Western District of Missouri.

Prior to trial, Stover's counsel filed a motion in limine to suppress testimony that Stover was a sentenced federal prisoner who had been incarcerated at the Sandstone Federal Correctional Institution at Sandstone, Minnesota, and had escaped from Sandstone on June 28, 1976. This motion was denied by the District Court, and the Government would not agree to a written stipulation offered by Stover that he had been at liberty in Sandstone, Minnesota, on June 28, 1976. At trial, evidence that Stover had escaped from Sandstone on June 28, 1976, was admitted over Stover's continuing objection. The Government also introduced into evidence the fingerprints taken by Agent Funderburke. The sole evidence introduced by defendant pertained to the fingerprints taken by the Lamar police.

After the initial instructions were given, the jury deliberated for approximately two hours and then submitted a series of written questions to the court, one of which asked, "Can you ~~make~~ have him testify?" The court recalled the jury, answered its questions and, over Stover's objection, reinstructed it on the issue of whether or not a criminal defendant must take the stand. This reinstruction took place late in the afternoon, and shortly thereafter the jury was excused for the day. When the jury returned on the following morning, the court, *sua sponte*, gave an *Allen* type instruction urging that it reach a verdict. The jury returned a verdict of guilty later the same day.

On April 4, 1977, Stover was sentenced to a four-year term of imprisonment. Three days later, the District Court entered a *nunc pro tunc* order modifying the April 4, 1977, order of commitment, and specifying that the four-year sentence was to run consecutively with the sentence Stover was already serving. On appeal, Stover challenges this "modification" in his sentence and also alleges that his conviction is invalid because of various errors attending his jury trial.

Stover contends that the only direct evidence connecting him with the offense charged consisted of fingerprints found on the rearview mirror inside the 1970 Chevrolet; that this evidence was the fruit of an unlawful arrest; and that the trial court, accordingly, erred in denying his motion to suppress.

■ We must reject this contention for the simple reason that, even if defendant's arrest be assumed to have been invalid, the latent fingerprints lifted from the 1970 Chevrolet were not a fruit of that arrest. FBI Agent Funderburke, who took the fingerprint lifts from the 1970 Chevrolet, was already in Lamar investigating this out-of-state vehicle, which had been reported stolen in Minnesota, when Stover was arrested by the Lamar police. Thus, the latent prints lifted from the Chevrolet, which ultimately connected Stover to the car, were obtained during a standard, independent federal investigation of an out-of-state car which had been reported stolen. Stover's arrest by Lamar police officers had virtually no causal relation to the FBI investigation of the 1970 Chevrolet. Accordingly, the trial court did not err in refusing to suppress the latent fingerprints lifted from the 1970 Chevrolet by the FBI.

■ Stover also contends that the District Court erred in allowing the introduction of evidence that he was a sentenced federal prisoner who had escaped from custody in Sandstone, Minnesota, on June 28, 1976. The 1970 Chevrolet involved in this prosecution was stolen approximately 80 miles south of Sandstone, in St. Croix, Minnesota, some 18 days after Stover's escape. Evidence of Stover's escape was introduced through the testimony of a correctional supervisor at Sandstone. This evidence was competent to show that Stover was in the vicinity where the car was stolen and that he had both the motive and intent to steal the car. *Gregory v. United States*, 365 F.2d 203, 205 (8th Cir. 1966), *cert. denied*, 385 U.S. 1029, 87 S.Ct. 759, 17 L.Ed.2d 676 (1967). Thus, there were issues upon which evidence of Stover's escape could be received and to which it was relevant. *See* Fed.R.Evid. 404. Moreover, the testimony on this issue was carefully limited to the bare facts that Stover had been incarcerat-

ed at Sandstone and had escaped on June 28, 1976. No details of Stover's prior conviction, incarceration or escape were put before the jury. The small amount of evidence adduced on this escape was clear and convincing, and we are persuaded that its probative value substantially outweighed the danger of unfair prejudice.

■ Stover further contends that there was insufficient evidence to establish the offense with which he was charged and that the District Court, therefore, erred in denying his motion for judgment of acquittal. He argues that the fingerprints lifted from the interior of the 1970 Chevrolet, standing alone, were not sufficient to show possession of the vehicle or to support the inferences that he knew the car was stolen and transported it interstate with this knowledge. Defendant misconstrues the quantum of evidence probative of his guilt, however, when he asserts that it was limited to the fingerprint lifts taken from the 1970 Chevrolet. There was also considerable circumstantial evidence pointing to Stover's knowing interstate transportation of the stolen vehicle. The evidence introduced by the Government showed that Stover had escaped from a federal penitentiary in Minnesota on June 28, 1976; that a 1970 Chevrolet had been reported stolen some 18 days later from a location 80 miles south of the penitentiary; that Stover and the stolen car had both turned up in Lamar, Missouri, six days after the theft of the car; and that Stover's fingerprints were found on the rearview mirror inside the stolen car. When this evidence is viewed in the light most favorable to the Government, and the Government is given the benefit of all reasonable inferences favorable to its case that may logically be drawn from the evidence, *United States v. Wisdom*, 534 F.2d 1306, 1309 (8th Cir. 1976), it is clear that the Government's evidence was sufficient to take the case to the jury and to support the jury's verdict.

■ Stover characterizes as erroneous certain supplemental instructions given by the trial court during the course of the jury's deliberation. After the jury had de-liberated for several hours, it submitted a list of written questions to the court, one of which pertained to Stover's failure to testify. In response to this question, the trial court reread to the jury, over Stover's objection, its original instruction on this subject. Stover contends that reiteration of this instruction placed undue emphasis on his failure to take the stand. The question submitted by the jury indicated confusion as to whether or not Stover could be compelled to testify. The trial judge acted entirely properly in reinstructing the jury on this fundamental matter by repeating the original instruction, for if he had responded with a different instruction, more confusion could have arisen, and if he had not responded at all, the jury could have been influenced by a misapprehension of Stover's constitutional right not to take the stand.

After approximately two hours of deliberation, the jury was excused for the night. When the jury returned on the following morning, the trial court, *sua sponte*, urged that it reach a verdict in a variation of the *Allen* instruction, *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896), and again explained the meaning of proof beyond a reasonable doubt.

This court has approved the *Allen* instruction as an original or supplemental charge when circumstances indicate that it has not had a coercive effect. *United States v. Wiebold*, 507 F.2d 932, 934 (8th Cir. 1974). We have also approved supplemental instructions that are of the *Allen* type. *United States v. Dawkins*, 562 F.2d 567 (8th Cir. 1977); *United States v. Singletary*, 562 F.2d 1058 (8th Cir. 1977). The instruction given here falls into this category; it is sort of a colloquial version of the classic *Allen* charge, which urges members of the jury to reexamine their views, directs their attention to the expense of trial and explains the meaning of proof beyond a reasonable doubt.

■ The jury had deliberated a bare two hours when this charge was given and we cannot say, after reviewing the record, that we are convinced of its necessity. On the

other hand, we can find no indication in the record that this instruction had a coercive effect on the jury or otherwise prejudiced Stover.[2] Accordingly, although we doubt that the *Allen* type instruction given here was necessary, we conclude that it was a harmless superfluity.

Finally, Stover attacks his sentence. He alleges that his original four-year sentence was to run concurrently with the federal sentence he was already serving, and that a subsequent order entered in his absence, which specified that the four-year sentence was to run consecutively, effected an improper increase in his sentence.

At allocution during the sentencing proceeding, Stover's attorney requested that Stover's sentence be made to run concurrently with the federal sentence he was already serving. The following colloquy then ensued:

> THE COURT: It will be the judgment of this Court that the defendant be committed to the custody of the Attorney General for a term of four years.
>
> MR. JONES (Assistant United States Attorney): Would that be consecutive or concurrent, your Honor?
>
> THE COURT: As far as I'm concerned—I am not going to make it concurrent with anything, just four-year sentence.

The judgment and commitment order signed by the trial court on April 4, 1977, simply committed Stover ·to the custody of the Attorney General for four years. Three days later, the trial court entered an order modifying the order of commitment. This modifying order specified that Stover's four-year sentence was "to be served consecutive to any federal sentence defendant is currently serving."

We find Stover's attack on his sentence, which is based upon a characterization of the original sentence as concurrent, to be without merit. At the sentencing hearing, the District Court made it clear

that he intended the four-year sentence to be consecutive to the federal sentence Stover was already serving. The modifying order entered three days later simply served to make the order of commitment conform more closely to the intention stated at the hearing and did not increase Stover's sentence or transform it from concurrent to consecutive.

Affirmed.

---

2. Neither the briefs nor the record state how much time elapsed between the giving of the *Allen* type charge and the jury's verdict. Moreover, there is no indication in the record that members of the jury had, after two hours of deliberation, assumed discernible minority and majority positions that might create a susceptibility to coercion.