UNITED STATES of America, Plaintiff,

v.

Kenneth James CALLAHAN and Donald Larson, Defendant.

No. Cr. 4–77–84.

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 9, 1978.

Andrew W. Danielson, U. S. Atty., Thorwald H. Anderson, Jr., Asst. U. S. Atty., Minneapolis, Minn., for plaintiff.

Ronald I. Meshbesher, Meshbesher, Singer & Spence, Ltd., Minneapolis, Minn., for defendant Callahan.

Bruce Hartigan, Minneapolis, Minn., for defendant Larson.

## MEMORANDUM AND ORDER DENYING MOTIONS FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL

DEVITT, Chief Judge.

Following verdicts of guilty to a one count indictment[1] charging violations of the kidnapping statute, 18 U.S.C. § 1201 (1970), defendants move for judgment of

---

1. The Indictment reads: "The United States Grand Jury charged that: On or about July 27, 1972, within the State and District of Minnesota, and elsewhere, the defendants, Kenneth James Callahan and Donald Larson, willfully and knowingly did transport in interstate commerce from the State of Minnesota to the State of Wisconsin, and thence from the State of Wisconsin to the State of Minnesota, Virginia L. Piper who had theretofore been unlawfully seized, confined, kidnapped, carried away and held by the said Kenneth James Callahan and Donald Larson for one million ($1,000,000.00) dollars ransom; in violation of Title 18, United States Code, Section 1201."

acquittal or for a new trial. They assert many grounds for the relief requested which are considered hereafter in the sequence of the case.

## PROSECUTOR'S STATEMENTS TO THE GRAND JURY

Immediately prior to trial, defendant Callahan moved to dismiss the indictment as to him on the ground that the prosecutor informed the grand jury, prior to indictment, that Callahan had taken and failed a polygraph examination regarding his involvement in the offense. The court withheld decision pending submission of briefs. Callahan's brief presents two different contentions. First, he argues that reference to the examination itself was impermissible, or if the statement could be made, that the prosecutor was obligated to inform the grand jury of the technological problems with polygraph examinations generally and the hearsay quality of the examination itself. Second, he contends that the statement was inflammatory and adversely affected the grand jury's neutrality.

■ At the outset, it should be noted that an indictment regular on its face, returned by a legally constituted grand jury, is presumed to be founded on competent evidence, and a heavy burden is placed on one who seeks to overcome the presumption. *United States v. West*, 549 F.2d 545 (8th Cir. 1977). The fact that polygraph examination results are inadmissible at trial does not suffice to taint the indictment in this case. In the first place, the federal rules of evidence are inapplicable to grand jury proceedings. Fed.R.Ev. 1101(d)(2).

Secondly, even if the rule barring admissibility of such evidence was applicable to a grand jury proceeding, the indictment can stand if there is some competent evidence to support it. *Laughlin v. United States*, 128 U.S.App.D.C. 27, 385 F.2d 287 (1967), adhered to, 154 U.S.App.D.C. 196, 474 F.2d 444 (1974), *cert. denied*, 412 U.S. 941, 93 S.Ct. 2784, 37 L.Ed.2d 402 (1974) and *Truchinski v. United States*, 393 F.2d 627 (8th Cir. 1968). The existence of such competent evidence is clear where, as here, a petit jury subsequently finds the defendant guilty beyond a reasonable doubt after a trial from which the inadmissible evidence is excluded. *Coppedge v. United States*, 114 U.S.App.D.C. 79, 311 F.2d 128 (1962), *cert. denied*, 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963). Thus, the presentation of the evidence to the grand jury does not dictate a dismissal of the indictment.

■ In support of its contention that the prosecution should have cautioned the grand jury respecting use of polygraph examinations, defendant primarily relies on those few cases in which an indictment was dismissed due to a prosecutor's failure to inform the grand jury that the testimony it was hearing was hearsay.[2] In analyzing the contention that the indictment should have been dismissed, the courts in these cases first recognized that an indictment is not invalid merely because it was based on hearsay evidence which would be inadmissible at trial. *United States v. Estepa*, 471 F.2d 1132 (2nd Cir. 1972) and cases cited therein. Furthermore, the courts held that the prosecution does not have an affirma-

---

2. These cases are from the Court of Appeals for the Second Circuit in which a few judges have advocated a "best evidence" rule in examining the sufficiency of an indictment. This rule would discredit an indictment based on hearsay where (1) nonhearsay evidence is readily available; (2) the grand jury is misled into believing it was hearing direct testimony rather than hearsay; and (3) there is a high probability that had the grand jury heard the eyewitness it would not have indicted. *See* cases cited in *United States v. Newcomb*, 488 F.2d 190 at n. 1 (5th Cir. 1974). As *Newcomb* pointed out, the rule is at best a supervisory guideline, 488 F.2d at 192. Any argument that the rule is constitu-

tionally mandated is foreclosed by *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) in which the Court held that an indictment based solely on hearsay was not constitutionally infirm. *Accord, United States v. Neff*, 525 F.2d 361 (8th Cir. 1975). Two circuits have relied on *Costello* in refusing to apply this rule. *United States v. Chanen*, 549 F.2d 1306, 1311 (9th Cir. 1977) and *United States v. Cruz*, 478 F.2d 408, 411 (5th Cir. 1973). Of course, in all of this, this court is assuming that the hearsay and polygraph problems are sufficiently analogous to justify the application of this rule.

tive duty to tell the grand jury that the evidence is hearsay. *Estepa, supra,* at 1136. The courts dismissed the indictments only after it was found that the prosecutor had misled the grand jury into believing that it was receiving eyewitness testimony when it was actually hearing hearsay. Such action by the prosecutor violated the second component of the "best evidence rule" explained in footnote 1, *supra.* In this case, there is no indication that the prosecutor affirmatively misled the grand jury into attaching inordinate weight to the polygraph examination. Additionally, when the other two aspects of the "best evidence" rule are considered, the sufficiency of the indictment in this case is unquestionable. There is no readily available evidence which could replace the polygraph examination as is the case when the prosecutor neglects to present the immediate declarant in favor of the hearsay alternative. Secondly, it cannot be said, and defendant does not contend, that there is a high probability that the jury would not have indicted absent the prosecutor's statement. Any doubts on that score were set to rest once the petit jury returned its verdict.

■ Finally, defendant contends that the statement was improper in the sense that it was inflammatory and prejudicial. The cases cited by defendant as well as many others are discussed in *United States v. Chanen,* 549 F.2d 1306 (9th Cir. 1977). As the court in that case noted, each case must turn on its own facts. *Chanen, supra,* at 1309.[3] As seen by the Ninth Circuit, the guidelines emerging from the cases ask whether the prosecutor's action constituted "fundamental unfairness" or posed "a threat to 'the integrity of the judicial process.'" *Chanen, supra* at 1311. The prosecutor's statement in this case did not cross these lines. As the extended discussion in *United States v. Alexander,* 526 F.2d 161

(8th Cir. 1975) indicates, the federal courts currently are taking a much closer look at the admissibility of polygraph examinations than was the case when the results of such examinations were summarily excluded. Given that the legitimacy of polygraph examinations has been heightened by the recent willingness of the courts to reconsider the question of their admissibility in criminal trials, it is hard to see how a reference to an examination before the grand jury raises the high probability of bias mandating dismissal of an indictment.

## CONDUCT OF LINE–UP

■ Some months prior to trial, the court denied the motion of both defendants to dismiss the indictment on the grand that the government was guilty of prejudicial misconduct by preventing counsel for defendant Callahan from interviewing witnesses who attended a lineup, this violating defendant's due process rights. The government did not deny that it would not permit defense counsel to interview its witnesses at that time. It claimed that government officers were conducting the lineup and did not want interference at that time by Callahan's counsel interviewing the witnesses then. It argued there was no interference with Callahan's counsel interviewing witnesses following the lineup or doing so at any time before trial. The only authority cited by defendants, *Gregory v. United States,* 125 U.S.App.D.C. 140, 369 F.2d 185 (1966), is inapposite since defendant's access to witnesses was not effectively barred. The court adhers to its earlier ruling denying these motions.

## PRE–INDICTMENT DELAY

At the same time, defendants also moved to dismiss the indictment claiming there

---

**3.** If the court were forced to find a specific precedent, the most similar case seems to be *Loraine v. United States,* 396 F.2d 335 (9th Cir. 1968), *cert. denied,* 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968). In that case, defendant moved to dismiss the indictment on the ground that the prosecutor had failed to inform the grand jury that three crucial witnesses had

previously engaged in criminal activity. The Court of Appeals, in upholding the District Court's denial of the motion, held that the government was not obligated to undermine the credibility of its own witnesses. In like manner, the prosecutor in this case was under no duty to impeach his own evidence by means of an admonition to the grand jury.

was unjustified preindictment delay and that this prejudiced defendants and denied them the right to a speedy trial and due process of law. No record was made in support of the claim of prejudice except counsel's affidavits. The court also denied these motions.

■ Preindictment delay does not violate the speedy trial clause of the Sixth Amendment. The statute of limitations provides "the primary guarantee against bringing overly stale criminal charges." *United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971). The due process clause does play a limited role in protecting against oppressive delay. Here, the government's position was that it did not previously indict defendants because it was continuing with its investigation up until the time of the return of the indictment. The Supreme Court held in June 1977 that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *United States v. Lovasco*, 431 U.S. 783, 796, 97 S.Ct. 2044, 2052, 52 L.Ed.2d 752 (1977).

■ It was not claimed, and it did not appear, that there had been an intentional prosecutorial delay. Dismissal of an indictment might be called for in those cases where a defendant could show at trial that preindictment delay caused substantial prejudice to his right to a fair trial and that the delay was an intentional device used by the government to gain a tactical advantage over the defendant. *United States v. Matlock*, 558 F.2d 1328 (8th Cir. 1977). But due process does not require a dismissal for preindictment investigative delay standing alone. *United States v. Lovasco, supra.* This claim was without merit and properly overruled.

## JURY SEQUESTRATION

■ Defendants complain of the denial of their motion to sequester the jury. Con-

finement of the jury during trial is a matter "which rests squarely within the sound discretion of the trial judge." *Koolish v. United States*, 340 F.2d 513 (8th Cir. 1965).

■ No claim is made, and there is no showing, that failure to sequester the jury was an abuse of discretion or prejudiced the parties. There is no representation that an attempt was made to tamper with the jury and no showing of prejudicial publicity in the news media.[4] At least twice each day during the trial the court admonished the jury not to read, listen to or observe newspaper, radio or television news items about the trial or parties involved or to talk to others, or permit others to talk with them about the case. No claim is made that these instructions were not followed. There was no demonstrated need to sequester the jury and no harm in permitting jurors to return to their homes at night during the trial period of this month-long trial. The jury was sequestered during deliberations.

## INTERROGATION OF JURORS

■ It is claimed the court erred in failing to ask the jury panel all the proposed questions submitted by defendants. The court did not ask each one of the many requested questions, since such would have been supererogatory, but it did make full inquiry into the name, family status and employment history of each potential juror and his or her spouse. Other pertinent subjects were covered and an examination of the colloquy between the court and jury panel members reflects particular inquiry into the impartiality of the panel members. All said they could be fair and impartial. Before any individual questioning of the jurors was conducted, those who said they had formed an opinion as to the guilt or non-guilt of defendants, about four or five, were immediately excused from the court-

---

4. Callahan's counsel was principally concerned about news publicity during trial that Callahan had taken three polygraph tests and had failed each of them. The results of these tests were not offered in evidence and to the court's knowledge, there were no news stories during trial about the lie detector tests.

room. The court offered to exclude all who had read or heard anything about the case but counsel for defendants said they would prefer if the court would not do this. Accordingly, the court did not exclude jurors who said they could be fair and impartial, notwithstanding prior knowledge about the case. The court proceeded on this basis and all jurors chosen said they could be fair and impartial.

## TRIAL STATEMENTS BY PROSECUTOR

■ Defendant Callahan claims the court erred in denying his motion to restrict the prosecutor from making a statement claiming there would be proof defendant Callahan authored the ransom note. There was no error in this. Such was a proper statement for the prosecutor to make and his evidence tended to support the claim. There was proof Callahan was the author of the ransom note. The court also cautioned the jurors that statements made by counsel were not evidence.

■ Defendant Callahan claims the prosecution was guilty of plain error by asserting in opening and closing argument that Callahan "planted" an alibi defense with witness Combs. No objection was made at the time to these statements by the prosecutor and the issue is first raised on these motions. The evidence offered by the United States could reasonably support the suggestion of the prosecutor.

## TESTIMONY OF WITNESS DINEEN

Defendants claim error in the court's failure to require witness Eugene John Dineen to undergo a psychiatric and physical examination before testifying because Dineen stated that he was incompetent and had taken narcotics on the day he testified. In essence, this is an attack on Dineen's competency to be a witness.

■ The basic guideline regarding competency to testify is found in Fed.R.Ev. 601—"[e]very person is competent to be a witness . . . ." As stated in the Advisory Committee's Notes to this rule,

No mental or moral qualifications for testifying as a witness are specified. Standards of mental capacity have proved elusive in actual application. A leading commentator observes that few witnesses are disqualified on that ground . . . Discretion is regularly exercised in favor of allowing the testimony. A witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility, subject to judicial and authority to review the sufficiency of the evidence. *Notes of Advisory Committee on Proposed Rules*, 28 U.S.C.A., Federal Rules of Evidence, 225–26.

The philosophy underlying this rule is that, generally, competency questions should not absolutely bar a witness' testimony. Rather possible incompetence should be developed through cross-examination as was done with respect to witness Dineen.

■ Despite this presumption of competency, the court held a competency hearing to determine if Dineen's drug use negated the threshold minimal level of competency required before a witness can take the stand. An examination of the record reflects that Dineen was physically and mentally qualified to testify. He said he did not use morphine, cocaine, heroin, or hard drugs. He stated that he had taken talwin, a synthetic morphine, at the prison that morning for his arthritis as he had on previous occasions. He said that the effects lasted about two hours, that they had worn off before he left the prison, and that he could no longer feel the effects when he was called to testify at 3:15 P.M.

Dineen is an old "con", having spent 33 of his 60 years in prison. Probably as an anticipatory defense to later accusations of being a "stool pigeon", he initially refused to testify, claiming he was incompetent. However, during the competency hearing, he testified in a clear and lucid manner recalling, for example, specific dates of his previous offenses and incarcerations, items he initially claimed he could not recall. Based on this hearing, the court saw no need for a psychiatric examination to deter-

mine Dineen's competency to take the stand. Nothing about his later testimony before the jury detracted from this conclusion.

█ Defendants also claim error in the court's refusal to admit a psychiatric report about Dineen. The first point to emphasize is that defendant's use of the term "psychiatric report" and "expert opinion" to describe this document is misplaced. There was no showing on the record that this report was anything more than a prison *medical* report or that the preparer of the report was qualified to make psychiatric evaluations. On cross-examination, Dineen testified that he had never undergone a psychiatric evaluation. Furthermore, the one psychologically-oriented evaluation of Dineen offered by the defense was admitted. Larson Ex. D–29. Finally, defendants did not indicate any legal basis for the report's admission into evidence. The report is clearly hearsay, and defendants did not suggest any applicable hearsay exception. The court has endeavored to find that exception on its own. The only possible exception is that found in Fed.R.Ev. 803(6) which allows admission of records of regularly conducted activity. However, no foundation for the report's regularity was laid.

## EVIDENCE OF GOVERNMENT OFFER OF LENIENCY

█ Defendants urge that it was error to exclude evidence that the government offered leniency to certain convicts in exchange for their cooperation in solving the kidnapping. This argument is made starting on p. 13 of Callahan's memorandum and apparently pertains to the proposed evidence from William Cooper, Thomas Grey, Harvey Carrigan and Thomas Reif. Cooper, Grey and Carrigan are convicted felons. Reif is Douglas County, Minnesota prosecuting attorney. Cooper was not present and defendants offered a transcript of a plea bargain tendered him by the United States in another criminal case. The court sustained objections to the introduction of the transcript of the plea bargain and to the

questions of the other three about offers of assistance by the government to Grey and Carrigan in exchange for their cooperation in the investigation of the kidnapping.

None of the above were prosecution witnesses and they offered no testimony against defendants. It should be noted that those convicts, such as Eugene John Dineen, who did testify for the government were vigorously cross-examined by defense counsel by way of impeachment as to alleged promises made to them by the government. No objection was made to this questioning and such is not in issue here.

█ Cooper offered to give information about the Piper kidnapping and the whereabouts of the ransom money in exchange for the dismissal of certain charges against him. Defendants sought to introduce the transcript of the plea bargain instead of having Cooper testify due to his absence from the jurisdiction. The statements contained in the plea bargain were hearsay without any of the necessary indicia of reliability for admission of such evidence. Fed. R.Ev. 801(c). They would not qualify as former testimony for Cooper had not been sworn. Fed.R.Ev. 804(b)(1). They certainly were not against his penal interest, since, if believed by the government, they would have worked to reduce rather than increase Cooper's criminal liability. Fed.R.Ev. 804(b)(3).

The court sustained objections to the evidence in question because it was not relevant to the issue of the guilt or non-guilt of defendants Callahan and Larson. Fed. R.Ev. 401. And even if relevant, its probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues and was properly excludable because of waste of time necessarily occasioned by the need to then hear extensive evidence and many witnesses for the government to explain the action taken. Fed.R.Ev. 403.

Defendants urge that the evidence was relevant to corroborate their claim that witnesses who did testify against defendants were "paid off" and to prove that the

government had a weak case and framed defendants. But the proffered evidence, rather than tending to prove that which defendants suggest, would only have shown that the government agents in conducting their investigation interviewed Carrigan and Grey and dozens of other convicted felons and sought to elicit from them testimony and cooperation in solving the kidnapping and as a part of standard police investigatory procedures, offered to assist the potential informers by recommendations for leniency or assistance before pardon and parole authorities. None of the proposed testimony was subject to the interpretation that the F.B.I. was trying to manufacture evidence or to frame defendants.

We are not dealing with *prima facia* misconduct such as an outright bribe offer to a witness for his false testimony. To be able to characterize the police conduct at issue here as police *mis*conduct, a second level of inference is necessary, *viz.* that the government engaged in this otherwise neutral conduct with a malignant intent. Defendants made no offer to show such an intent but only offered the conduct and asked that such an intent be inferred from it. Thus, the cases cited by the defendants holding that prosecutorial misconduct is relevant evidence are one step removed from this case, for in those cases the alleged conduct was not neutral but amounted to actual misconduct.[5]

The proposed testimony was of doubtful relevancy but if relevant, would be prejudicial and necessary rebuttal to it would require undue consumption of time. McCormick states, "But relevancy is not always enough. There may remain the question, is its value worth what it costs?" E. Cleary, *McCormick on Evidence* § 185 at 438 (2nd ed. 1972). This guideline is clearly established in the Federal Rules of Evidence by Rule 403.

If evidence of the kind offered were received, the government would have had to rebut it to show the nature of its leads against each other convict as to whom an investigation was conducted and to whom offers of assistance had been tendered. This well might turn the trial away from its purpose of fixing guilt or non-guilt of the defendants into an inquiry into the merits of the government's investigative technique and a re-enactment of the F.B.I.'s investigative activities involving thousands of leads over a five year period. "This balancing of intangibles—probative values against probative dangers—is so much a matter where wise judges in particular situations may differ that a leeway of discretion is generally recognized." *McCormick on Evidence; supra* at 440.

It was a proper exercise of discretion to exclude the offered testimony of these witnesses. Fed.R.Ev. 403; Uniform R.Ev. 45; 1 J. Weinstein and M. Berger, *Weinstein's Evidence*, 403[01] and 403[02] (1975); *United States v. Burch*, 490 F.2d 1300, 1303 (8th Cir. 1974); *United States v. Willis*, 482 F.2d 1034 (8th Cir. 1973); *United States v. Madden*, 482 F.2d 850 (8th Cir. 1973); and *United States v. Cole*, 449 F.2d 194 (8th Cir. 1971).

### STATEMENT OF ABORTIVE WITNESS BURT

Defendants assign as error the court's refusal to admit a 36-page statement of Lynda Lee Burt in which she claims that others than the defendants planned and executed the Piper kidnapping. The statement was to have been used as a declaration against penal interest, Fed. R.Ev. 804(b)(3), in lieu of testimony because Ms. Burt was allegedly unavailable. But no sufficient showing of unavailability was made (see discussion below concerning at-

---

5. *See*, e. g., *United States v. Graham*, 102 F.2d 436 (2nd Cir. 1939) (government witness testified at third trial that his testimony at two prior trials was false); *Williamson v. United States*, 311 F.2d 441 (5th Cir. 1962) (government offered witness a fee contingent upon the conviction of defendants); *Ellico v. United States*, 19 F.2d 232 (6th Cir. 1927) (witness offered to leave town if defendant purchased property from witness); *DiSalvo v. United States*, 2 F.2d 222 (8th Cir. 1924) and *Lewis v. United States*, 4 F.2d 520 (5th Cir. 1925) (evidence of entrapment erroneously excluded).

tempts to subpoena Ms. Burt). Even if she had been unavailable, it is not at all clear that the statement was against her penal interest allowing admission of her statement as an exception to the hearsay rule. Throughout the statement Ms. Burt disclaims any involvement in the planning or execution of the crime.

Even assuming hers was a declaration against penal interest, there remains the question whether the material was relevant. In addition to the kidnap conspiracy alleged by Ms. Burt, there were claims of at least two Piper kidnap conspiracies, other than the one involving defendants, one headed by a William Cooper and another by Harvey Carrigan. These persons were among hundreds of others, most of whom had criminal records, who had been suspects and had been investigated by the government. The F.B.I. followed literally thousands of leads. No credible evidence was found to associate any of the suspects, other than defendants, with the Piper kidnapping.

It would have been unwise to permit the trial of these two defendants to be diverted into an exposition of the F.B.I.'s investigation of numerous other suspects against whom there was no case. It would have necessitated a rebuttal by the government showing the investigation of each such person and how the investigation showed that each such person was not responsible for the kidnapping. Many witnesses would have been required to make such a showing as to each of the many suspects.

The probative value of such proposed evidence by witness Burt, and similarly the evidence of others who could testify about other suspects, was substantially outweighed by the danger of confusion of the issues, unfair prejudice, and misleading of the jury. Admission of the evidence would have been a waste of time and would have turned a trial involving the guilt or non-guilt of these defendants into an extensive portrayal by both sides of the many fruitless leads investigated by the government.

## MOTION TO REOPEN

Defendants claim the court erred in denying their motion to reopen the case after all parties had rested in order to hear the testimony of Lynda Burt.

 The record shows defendants rested in the middle of the afternoon of October 28, 1977. The government offered no rebuttal and rested. The remainder of the court day was devoted to discussion of instructions and allocation of time for argument of counsel. Jury arguments were to begin at 9:30 A.M. on Monday, October 31, 1977. At 9:15 A.M. on that day defendants came into chambers and moved to reopen to offer the testimony of Lynda Burt who, it was claimed, would say she knew that persons other than these two defendants were responsible for the Piper kidnapping (see discussion above concerning exclusion of her written statement).

Government counsel objected. He said he had given defense counsel the F.B.I. reports on the Lynda Lee Burt interview, *supra*, many weeks before trial so they should have subpoenaed her long before resting on October 28. Defense counsel represented they tried to serve her on at least two occasions but could not locate her. The United States Marshal was not given a subpoena to serve until noon on October 28. He served it promptly about 3:00 P.M. that day in Winona, Minnesota at Ms. Burt's home. The Marshal had no trouble serving her. But notwithstanding that the subpoena was outstanding, defense counsel rested that day without reserving the right to reopen and without advising the court or United States Attorney of their contrary intentions. The United States Attorney rested and discharged his witnesses. He had seven rebuttal witnesses available for testimony in the event witness Burt had testified.

In this situation fairness required denial of the motion to reopen. Defense counsel were at fault for the situation in which they found themselves. The prosecution would have been prejudiced by permitting a reopening. The evidence, if admissible, would have carried a distorted importance. *United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 1397, 91 L.Ed. 1654 (1947).

Defense counsel knew early in the trial that the court would not receive the F.B.I. report of the Burt interview because it was hearsay, *supra.* Defense counsel should have had the Marshal serve her then instead of waiting until the last day. Had defense counsel advised the court and prosecutor on Friday, October 28, that the witness had been subpoenaed and they intended to move for reopening on October 31, their motion might have reflected a good faith endeavor. Of course, knowing the Marshal was serving the subpoena, they should not have rested or they should have rested with reservation to reopen if process was served.

Even if defendants had been permitted to reopen, there still remained the question as to whether Ms. Burt's testimony would have been admissible in light of Fed.R.Ev. 403, a factor to be considered on a motion to reopen, *United States v. Young,* 488 F.2d 1211, 1214 (8th Cir. 1973). The same considerations discussed above in regard to the admissibility of Ms. Burt's statement are applicable here, i. e., the fact that hers was one of several alleged kidnap conspiracies and the people she claims were the kidnappers were several among dozens of suspects. These factors reduced substantially any probative worth her testimony might have possessed, making the denial to reopen a proper exercise of the court's discretion. *United States v. Webb,* 533 F.2d 391, 395 (8th Cir. 1976).

## INSTRUCTIONS ON THEORY OF CASE

██ Defendants assert the court abused its discretion in not instructing the jury that defendants claimed the government fabricated evidence against them. They claim that this was their "theory of the case" and that the jury was entitled to be so informed. The defenses in this case were identity and alibi—that defendants were not the kidnappers and were either fishing, at home or at a bar-restaurant at the time of the kidnapping. The court informed the jury of these defenses. There was no evidence to support a claim of government fabrication.

Defense counsel argued to the jury that because this case had been investigated for so long and an indictment returned only a short time before running of the statute of limitations, the government had no case, or at most a very weak case, against these defendants. Callahan's counsel referred to this as a "frame" of the defendants because there was no one else to indict. But this argument runs to the claimed weakness of the government's case and the strength of the defense of non-identity and alibi upon which the jury was charged.[6]

## DELIBERATIONS OF JURY

Defendants seek a new trial claiming that the jury conducted unauthorized experiments during deliberations, that the court communicated with the jury absent defendants and counsel, and that the jury was subject to a traumatic experience by being isolated in an inoperable elevator in their hotel for an hour and a half the morning of November 4, 1977 prior to resuming deliberations that day.

The jury experiment to which the claim is addressed probably is based on a newspaper report in which one of the jurors is quoted as saying she put one of her stockings over her head to see how much could be seen through it. This was allegedly done in order to evaluate the testimony of Virginia Piper who testified that she had inadvertently glanced at one of the kidnappers who was wearing a stocking and had determined that one of his eyes was inordinately red. The same account quotes the juror as saying, "I can't imagine that she could have seen much through it."

██ There is no official record of the event, but if it was as reflected, it would

6. Defendants cite several cases in support of their argument. *Bird v. United States,* 180 U.S. 356, 21 S.Ct. 403, 45 L.Ed. 570 (1901), *United States v. Vole,* 435 F.2d 774 (7th Cir. 1970) and *United States v. Alfonso-Perez,* 535 F.2d 1362 (2nd Cir. 1976). We have no disagreement with these holdings but they deal with situations where the requested "theory of the case" instruction pertained to the actual defense upon which evidence had been received.

not reach the level of impropriety. Juror experiments are proper where they are not extraordinary and are within the bounds of the evidence. No prejudice resulted and as the Court of Appeals for the Seventh Circuit observed in connection with a similar claim, "jurors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdict." *United States v. Hephner,* 410 F.2d 930, 936 (7th Cir. 1969): The same applies to an alleged juror experiment in which pieces were torn off a paper bag. This is not an unusual experiment and there is no claim that it was conducted in circumstances other than those which reasonably existed when the bag in evidence was torn.

The claim of the court's communication with the jury absent defendants and their counsel is without any foundation. The court did not communicate directly or indirectly with the jury except in the courtroom with all parties present. When the jury retired for the day about 5:45 P.M. on November 2, they told the Marshal they wanted to consult the court. The Marshal telephoned the court at his home. The court told the Marshal to tell the jurors if they wanted further instructions or counsel to communicate with him in writing the next morning when all necessary parties would be present. No written request for further instructions or consultation was received.

The claim for a new trial based on the fact the jury was stuck in an elevator at the Radisson Hotel for an hour and a half is without merit. There is no claim or showing that this affected the jury's competence or impartiality. The event was widely publicized on radio and television early that day. Defendants' counsel said at 11:50 A.M. that day that they "heard about it". No claim of prejudice or motion for mistrial was made. It was only after the jury returned the verdicts of guilty that defendants' counsel viewed the incident as grounds for relief.

## SPELLING TEST GIVEN TO DEFENDANT CALLAHAN

According to the post trial affidavit of defendant Callahan dated November 11, 1977, at some point after the verdict was returned, Callahan recalled that he had been given a spelling test by an F.B.I. agent, the results of which were not included in the 16,000 pages of F.B.I. reports turned over to defendants prior to trial. He claims that the results of this test would have tended to establish his innocence since an alleged key item of evidence was the fact that Callahan, in an earlier letter, and the author of the kidnappers' communications had both misspelled the word "approach." That being the case, he argues that the prosecution was constitutionally obligated to give defendant the test results under the rules established by *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). These cases require the prosecution to disclose all material evidence favorable to the accused.

The first problem with this contention is that Callahan admits that he knew of the potentially exculpatory information prior to trial but states that he had forgotten it. This fact calls into question the applicability of *Brady* to this case in the first place. In *Agurs,* the most recent Supreme Court pronouncement on this issue, Justice Stevens, writing for a majority of seven, stated that the disclosure obligation attaches in situations where there is ". . . discovery, after trial of information which *had been known to the prosecution but unknown to the defense*" (emphasis added). *United States v. Agurs, supra,* 427 U.S. at 103, 96 S.Ct. at 2397. In this case, it appears that the reverse situation might well exist. Although the court is hampered in its understanding of the facts by defendants' failure to formalize the record on this point, it appears that after receiving Callahan's affidavit, the prosecutor asked the F.B.I. agent who allegedly gave the spelling test to describe it to him. The agent stated that he had asked Callahan to spell the words "occur" and "center" and that Calla-

han correctly spelled them. Callahan refused to participate further, and the agent decided to exclude the test from his report of the interview since he felt that the truncated test was inconclusive. Callahan does not contend, and it does not appear, that the prosecutor was personally aware of this one small incident in a five year investigation. On the other hand, as noted above, Callahan recalled the aborted interview shortly after the verdict was returned.

Callahan seeks to rebut the significance of the prosecutor's lack of knowledge by pointing to cases holding that knowledge of the investigating agent is imputed to the prosecutor with respect to *Brady* material since the judicial concern is to protect the accused's right to a fair trial and not to penalize the prosecution. *United States v. Sutton*, 542 F.2d 1239 (4th Cir. 1976) and *United States v. Marrero*, 516 F.2d 12 (7th Cir. 1975), *cert. denied*, 423 U.S. 862, 96 S.Ct. 120, 46 L.Ed.2d 90 (1975). At first blush, defendant's argument seems persuasive. However, in both of these cases, the omitted evidence allegedly demonstrated that key prosecution testimony was perjured. The distinction between that type of case and the type involved herein, where the disclosed evidence is exculpatory but does not indicate prosecutorial misconduct, was carefully drawn in *Agurs*. *United States v. Agurs, supra* 427 U.S. at 103, 96 S.Ct. at 2397.

In *Agurs*, the court emphasized the importance of notice to the prosecutor of allegedly exculpatory data not indicating perjury in stipulating a less stringent standard of materiality for the situation where the defense makes no discovery request or merely makes a request for "all *Brady* material". *United States v. Agurs, supra*, 427 U.S. at 104–108, 96 S.Ct. at 2398–99. If the materiality definition is narrowed when the prosecutor does not have notice of the information by means of a defense communication, it seems apparent that the disclosure obligation is even less onerous when notice is not conveyed either in that fashion or via actual knowledge of the undisclosed evidence. The entire thrust of *Agurs* is to place a heavy burden of examination and

disclosure on the prosecutor when the omitted information demonstrates possible perjury or when the defense makes a specific discovery request. Implicit in this focus is the idea that the prosecutorial duty to disclose must be balanced against the defendant's right to a fair trial. As the information becomes more important or as the degree of prosecutorial notice of it increases, the duty to disclose broadens. Conversely, this balance tips most acutely in favor of the prosecution when the evidence does not demonstrate perjured testimony and when the prosecutor is not put on notice of it either by a defense request or actual knowledge.

This balance is even more favorable to the prosecution in this case since Callahan admits that he knew of the interview in issue. Thus, a simple defense request for the results of the spelling test would have allowed full development of this evidence at trial. Callahan points to *United States v. Bonanno*, 430 F.2d 1060 (2nd Cir. 1970), *cert. denied*, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970) as holding that defense knowledge of the exculpatory information is irrelevant to the *Brady* determination. However, in that case, defense knowledge was not coupled with prosecutor ignorance as is the case herein. In *Bonanno*, the prosecutor personally knew of the potentially exculpatory information one week before trial. This state of affairs leads the court to conclude that the rule articulated in *Brady* has no application to the situation at bar. However, if it does, it would seem that the standard of materiality dictated by *Agurs* for a similar type of situation is even more relaxed.

In analyzing Brady's command that all *material* exculpatory information be disclosed to the defense, *Agurs* mandated a definition of materiality which varies according to the quality of the omitted evidence and the degree to which the prosecutor was apprised of its existence. *United States v. Agurs, supra* 427 U.S. at 103–114, 96 S.Ct. at 2397–2402. First, if the evidence tends to show that the prosecutor employed perjured testimony, it is material

if there is a reasonable likelihood that the false testimony could have affected the jury. Second, if the evidence is exculpatory but does not indicate perjury and a specific defense request was made for its production, the standard of materiality is unclear. *United States v. Agurs, supra,* text at n. 14. Third, if the omitted data is exculpatory not indicative of perjury, and not specifically requested, it is material and must be disclosed only if it creates a reasonable doubt of guilt. Finally, if the evidence is exculpatory, not demonstrative of perjury, not specifically requested, and obtained from a neutral source, a new trial must be ordered only if the newly discovered evidence probably would have resulted in an acquittal.

It would seem that the materiality definition to be applied in this case, where the evidence is exculpatory, not indicative of perjury, not specifically requested, not otherwise known to the prosecutor, and known to the defense lies somewhere between the standards to be applied in the third and fourth situations. The court feels that it would be improper for a trial court to fashion a new standard and will resolve the issue by resolving any questions as to the actual application of the more strict reasonable doubt standard in favor of a conclusion of non-materiality. In doing so, the court recognizes that it is ". . . dealing with an inevitably imprecise standard." *United States v. Agurs, supra* 427 U.S. at 108, 96 S.Ct. at 2399.

The issue now becomes whether the fact that Callahan properly spelled two words which were misspelled in the communications from the kidnappers would have created a reasonable doubt in the minds of the jurors given that he had misspelled "approach" in precisely the same way that it had been misspelled by the kidnappers.[7] The court thinks not. The evidence Calla-

han seeks to use to obtain a new trial does not deal with his misspelling of "approach." Even after one concludes that his proper spelling of "occur" and "center" may create a doubt that he authored the kidnappers' notes, one is still faced with the misspelling of "approach," the only misspelling stressed by the government. Defendant did nothing to explain the coincidence—it did not show by experts or otherwise that such a misspelling was common or that it constituted a typical "typo" for a typist. The glaring fact remains that Callahan wrote "approuch" in his Pardon Board letter and that the kidnapper notes contained "approach." The correct spelling of "center" and "occur" does little to reduce the significance of the inference to be drawn from that coincidence—namely that Callahan was the author of the kidnappers' notes. For these reasons, the court does not believe this new evidence would have created a reasonable doubt in the minds of the jurors and thus it is not grounds for a new trial.

## SUFFICIENCY OF THE EVIDENCE

Although defendants have enumerated many claimed trial errors for the relief requested, the principal thrust of their arguments is directed toward a judgment of acquittal or a new trial on the grounds the verdict was contrary to law and the evidence and "in the interest of justice." (Defendants' motion for judgment of acquittal, paragraphs 1, 2, 3, 4 and 8 and motion for new trial, paragraphs 1, 25, 26, 27, 28 and 29).

■ In connection with these contentions, reference should be made to the authority of a federal trial judge to disturb the verdict of the jury in a criminal case. Rule 29(a) of the Federal Rules of Criminal

---

7. The words misspelled by the kidnappers are "center" and "occurs". Center is spelled in the British fashion, "centre", in government exhibits 13(a) and 15(a). The case for a misspelling of occurs is much weaker since although it is spelled "occures" in government exhibit 12(a), occur is spelled correctly in the same communication and occurs is spelled correctly in government exhibit 14. Thus, the factual premise of Callahan's argument, that he spelled correctly words which were misspelled by the kidnappers, is seemingly non-existent with respect to occur. This conclusion is buttressed when it is recalled that the F.B.I. agent asked Callahan to spell the singular "occur" which is correctly spelled the only time it appears in the communications.

Procedure requires a judgment of acquittal "if the evidence is insufficient to sustain a conviction." And in ruling on the motion

> "[t]he court is limited to deciding whether a sufficient showing has been made to go to the jury on the basis of the view of the evidence and inferences therefrom most favorable to the prosecution." 2 C. Wright, *Federal Practice and Procedure (Criminal)*, § 467 at 529 (1969).

*United States v. Stover,* No. 77–1288, 565 F.2d 1010 (8th Cir., filed Nov. 10, 1977). *United States v. Fryer,* 419 F.2d 1346 (8th Cir. 1969) *cert. denied,* 397 U.S. 1055, 90 S.Ct. 1399, 25 L.Ed.2d 672. *Moore v. United States,* 375 F.2d 877, 879–880 (8th Cir. 1967). Judge Prettyman gave a classic statement of the rule when he said:

> " * * * if a reasonable mind might fairly have a reasonable doubt or might fairly not have one, the case is for the jury and the decision is for the jurors to make." *Curley v. United States,* 81 U.S. App.D.C. 389, 392, 160 F.2d 229, 232 (1947).

■ Rule 33 of the Federal Rules of Criminal Procedure authorizes the grant of a new trial "in the interest of justice." Such a motion is addressed to the sound discretion of the court but "the power should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." 2 C. Wright, *Federal Practice and Procedure (Criminal)* § 553 at 487 (1969).

So the question is whether, on the evidence presented, the jury properly could find either guilt or non-guilt and, finding guilt, whether such was a mistake or a miscarriage of justice. Without objection the court instructed the jury:

> " * * * you may permissibly conclude that the evidence in this case shows each of these defendants to be guilty beyond a reasonable doubt. You may also permissibly conclude that the evidence does not show the guilt of each of these defendants beyond a reasonable doubt. What I am saying is that it is up to you. * * "

The court is fully satisfied that the jury reached a permissible verdict not contrary to law or the facts and, weighing the evidence and credibility of the witnesses, I am satisfied the jury reached a proper verdict.

■ In ruling on a motion for judgment of acquittal, the court must approach the evidence from the standpoint most favorable to the government and assume the truth of evidence offered by the prosecution. 2 C. Wright, *Federal Practice and Procedure (Criminal),* § 553 at 486 (1969) and *United States v. Stover,* No. 77–1288, 565 F.2d 1010 (8th Cir., filed Nov. 10, 1977).

■ The evidence of guilt offered by the government was very substantial, albeit much of it circumstantial rather than direct. But as the court instructed the jury the law makes no distinction between the weight to be given to either direct or circumstantial evidence, nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. *United States v. Little,* 562 F.2d 578 (8th Cir. 1977).

■ Viewing the evidence in the light most favorable to the government, as I must, the jury was justified in finding that the following events occurred. On Thursday, July 27, 1972, at approximately 12:45 P.M., Donald Larson and Kenneth Callahan abducted Mrs. Virginia Piper from her home at 445 Spring Hill Road, Orono, Minnesota. Callahan and Larson were masked and carried .22 caliber pistols in each hand. A ransom note was left in the home, demanding $1,000,000 in $20 bills for Mrs. Piper's safe return. Mrs. Piper was driven to a site in Jay Cooke State Park in Carlton County, Minnesota, being transported in a 1972 Chevrolet Monte Carlo which had been stolen on July 11, 1972 from Larson (now Baldwin) Chevrolet in Minneapolis. Enroute to Jay Cooke State Park, the car traveled through a portion of the State of Wisconsin. Kenneth Callahan remained with Mrs. Piper in the woods while Donald Larson drove the Monte Carlo back to the Twin Cities for use in collection of the ransom money.

The victim's husband, Harry C. Piper, is an investment broker and Chairman of the Board of the brokerage firm, Piper, Jaffray and Hopwood. Mr. Piper arranged with the First National Bank of Minneapolis for delivery of the $1,000,000 in $20 bills. At approximately 9:10 P.M. on July 28, 1972, Mr. Piper received a telephone call during which a tape recording of his wife's voice was played. The tape recording contained instructions for Mr. Piper to drive to a signpost at the intersection of Louisiana and Laurel, in Golden Valley, Minnesota. There he found a note directing him to drive to the rear of a nearby Bridgeman's Ice Cream Parlor, where he was to transfer the money from the trunk of his own car to the trunk of the Monte Carlo used in the kidnapping. Mr. Piper was to identify the Monte Carlo by strips of tape on the rear window. Another instruction note was found in the glove compartment of the Monte Carlo, and Mr. Piper was directed to several intermediate stops, picking up further notes as he proceeded. He made three stops and ultimately was instructed to abandon the car at a Holiday Village store on South Lyndale Avenue in Minneapolis. At one of the stops, the money was removed from the trunk of the car.

On the evening of July 28, 1972, Mrs. Piper was chained to a tree and abandoned by Callahan, who was picked up and driven to Minneapolis by Larson. On the next day, at 9:05 A.M. July 29, 1972, the Reverend Kenneth Hendrickson, Pastor of the American Lutheran Church, 2455 Zane, Golden Valley, Minnesota, received a call from an unknown male who advised, "This is not a hoax," and gave instruction as to Mrs. Piper's location. At 2:15 P.M. on July 29, 1972, Alice Codden, an employee of Brother DePaul's House of Charity, 250 17th Avenue, Minneapolis, received a call from a male caller who asked for Brother DePaul, and when told that Brother DePaul was out, he asked for a priest. The caller then gave instructions as to Mrs. Piper's location. Mrs. Piper was ultimately found at 12:14 P.M. on July 29, 1972, by F.B.I. agents.

Approximately $4,000 of the ransom money has been found in circulation. Callahan passed some of the money at several southern Minnesota banks and at a suburban Minneapolis clothing store.

Trial of the case was between October 11, 1977 and November 4, 1977. The government presented 52 witnesses and numerous exhibits. Following is some of the significant evidence connecting these defendants to the crime:

1. Larson's fingerprint was found on a portion of a paper sack recovered from the car used to transport Mrs. Piper. The remainder of the sack was found in Jay Cooke State Park with the kidnap victim where it was used to hold food for Mrs. Piper.

2. Also found in the kidnap car, a Monte Carlo, was a strand of head hair microscopically identical to the known hair sample of defendant Callahan.

3. Callahan asked convict John Dineen at the Minnesota State Prison how to "launder" a large amount of $20 bills.

4. Larson was seen before the kidnapping by John Dineen wearing a distinctive St. Olaf College sweater like the one given by the kidnappers for Mrs. Piper to wear.

5. Pictures taken at his daughter's wedding in 1974 show Callahan to be identical in appearance to the artist's conception of the person who used ransom money to buy clothes from John Curdenas in 1974 at a suburban Minneapolis store.

6. Callahan was shown to be identical in appearance with the person passing ransom bills at several southern Minnesota banks in November of 1972.

7. Former convicts Harold Combs and Paul Harris saw Callahan and/or Callahan and Larson with handcuffs before the kidnapping. Defendants told Harris they bought them in Duluth. The handcuffs used to restrain Mrs. Piper were purchased in Duluth.

8. Before the kidnapping Larson inquired of Paul Harris as to what Harris knew about Harry C. Piper, husband of the victim.

9. Callahan spent consecutively numbered Philadelphia Federal Reserve Notes issued by a Philadelphia bank. Ransom twenty dollar bills were circulated in the Philadelphia area.

10. Callahan misspelled approach as "approuch" three times in one ransom note. He previously did the same in a letter to the Pardon Board.

11. Callahan's voice was identified as being like that of a kidnapper by four persons—Mrs. Piper; Bernice Bechdoldt, and Verretta Zimmerman, housekeepers at the Piper home; and Rev. Hendricks, to whom the kidnappers reported Mrs. Piper's place of confinement.

12. Larson was not at home at the time of the kidnapping and told his sister-in-law that he had been "up north fishing with Kenny."

13. Callahan smokes Kool cigarettes. Kool cigarettes were given to Mrs. Piper in the woods and were found near the scene of her captivity.

14. Callahan and Larson were long-time close friends and fellow participants in past criminal conduct.

In addition to proving defendants committed the kidnapping, it was necessary for the government to show the victim was transported interstate in order to prove a violation of federal law. The court refused to instruct, as requested by the prosecutor, that interstate transportation could be presumed upon failure to release the victim within 24 hours, 18 U.S.C. § 1201(b).

Therefore, the government sought to prove the interstate character of the kidnapping through the testimony of Mrs. Piper and an agent of the Federal Bureau of Investigation who accompanied her on a re-enactment of the kidnappers' route. This route passed through Wisconsin and approached the place of her confinement in Jay Cooke State Park from the north. It necessitated a *right* turn off highway 23 into the woods. On the other hand, defendants sought to show that some other routes to Jay Cooke Park could have been taken which did not run through Wisconsin and/or to show that even if the route from the north on highway 23 requiring a *right* turn was actually taken, such did not pass through Wisconsin because that small strip of Wisconsin land was now part of Minnesota and was maintained by that state's highway department. The court determined that the small thumb of land on highway 23 was in Wisconsin and without objection, instructed the jury accordingly.[8] The jury permissibly concluded from all the evidence that transportation of Mrs. Piper after her kidnapping was through a part of Wisconsin and was therefore "in interstate commerce" as required by the statute, 18 U.S.C. § 1201.

These defendants were competently represented by experienced lawyers well versed in the field of criminal law. They conducted vigorous cross-examination of the government's witnesses and well presented defendants' defense. The principal defense was alibi—each defendant sought to account for his presence at some time and place other than when and where the kidnapping occurred. Many witnesses supported the alibi defense, including family members, bar-restaurant waitresses, business associates, friends and fishing partners.

As noted, the government presented a strong case for guilt as to each defendant albeit much of its evidence was circumstantial rather than direct. The jury was instructed that the law makes no distinction between the two kinds of evidence but only requires proof beyond a reasonable doubt. *United States v. Little,* 562 F.2d 578 (8th Cir. 1977).

8. *I specifically instruct you with reference to* Government's Exhibit 19 which is a map of the area up there, that the thumb of land shown in Government's Exhibit 19 as being in the state of Wisconsin through which Minnesota State Highway 23 passes is in Wisconsin, and if you find beyond a reasonable doubt that Mrs. Piper was transported over that highway and across that thumb of land, however short a distance it is or whoever has legal title to the highway, a state line was crossed as meant in the statute, and that Mrs. Piper was transported across state lines and in interstate commerce.

The jury was fully instructed on reasonable doubt and the presumption of innocence and at the request of the defendants was specifically instructed that they "must not draw any inference of guilt from the fact that neither of these defendants has testified and that fact is not a proper subject for discussion or consideration when you get to the jury room."

The jury took ample time to consider all of the evidence and reached the unanimous verdict that the government had proved its case beyond a reasonable doubt. This was a permissible verdict well supported by the evidence; and in my view, a proper verdict.

The defendants had a fair trial without prejudicial error and defendants' motions for judgment of acquittal or a new trial are DENIED.