IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

_____

JOHN CHRISTIAN HANSEN II,
*Petitioner*,


*v.*


HON. JAVIER CHON-LOPEZ,
JUDGE OF THE SUPERIOR COURT OF THE STATE OF ARIZONA,
IN AND FOR THE COUNTY OF PIMA,
*Respondent*,


*and*


THE STATE OF ARIZONA,
*Real Party in Interest.*


No. 2 CA-SA 2021-0015
Filed November 9, 2021

_____


Special Action Proceeding
Pima County Cause No. CR20202717001

**JURISDICTION ACCEPTED; RELIEF GRANTED**

_____


COUNSEL

Law Office of Hernandez & Hamilton PC, Tucson
By Joshua F. Hamilton and Carol L. Lamoureux
*Counsel for Petitioner*

Laura Conover, Pima County Attorney
By Amy S. Ruskin, Deputy County Attorney, Tucson
*Counsel for Real Party in Interest*

_____

**OPINION**

Judge Eckerstrom authored the opinion of the Court, in which Presiding Judge Espinosa and Vice Chief Judge Staring concurred.

_____

E C K E R S T R O M, Judge:

¶1            In this special action, petitioner John Hansen challenges the respondent judge's denial of his motion to remand the underlying charge of child molestation to the grand jury for a new finding of probable cause, pursuant to Rule 12.9, Ariz. R. Crim. P.  We are asked to decide whether polygraph evidence, which is inadmissible at trial under Arizona law, may be introduced to a grand jury, particularly when it is favorable to the defense and has been offered as clearly exculpatory evidence. We conclude the respondent judge correctly found such evidence per se inadmissible. Nevertheless, based on the state's violation of its obligation under *Trebus v. Davis*, 189 Ariz. 621 (1997), coupled with the unfair presentation of its case, the respondent abused his discretion in denying Hansen's Rule 12.9 motion. We therefore grant special-action relief and reverse the order.

**Factual and Procedural Background**

¶2            Hansen married Heather in April 2010.  Heather had two children, Z.A. and T.A., from her August 2003 marriage to Greg, which ended in January 2010.  Heather and Hansen, who have two children in common, twins J.H. and G.H., were divorced in August 2018.  In June 2020, when Z.A. was fourteen years old, she told a friend, and then Heather, that Hansen had molested her about five years earlier.  Heather reported the allegation to law enforcement.  Z.A. was forensically interviewed at the Child Advocacy Center (CAC).  Z.A. claimed that Hansen had molested her after a shopping trip to Costco with her older brother T.A., and that T.A. was the only other person in the house when this occurred.  In July 2020, Hansen was charged by indictment with one count of child molestation, which allegedly was committed between January 1 and July 22, 2014.  In light of certain defects, the case was returned to the grand jury for a new presentation of the evidence.

¶3            In October 2020, in anticipation of the second grand jury proceeding, through his counsel Hansen sent a ten-page letter to the prosecutor assigned to the case, emphatically denying he had committed

the offense. He requested she either dismiss the charge or, pursuant to *Trebus* and its progeny, present to the grand jury the "clearly exculpatory information" outlined in the letter and supported by nearly 240 pages of attachments. Hansen pointed to text messages and photographs that reflected Z.A. had a warm, positive relationship with him—arguably inconsistent with her having been victimized—even after Hansen and Heather separated. Hansen asserted in the letter that the offense could not have been committed in 2014, as alleged in the initial indictment, given documentation that showed Z.A. could not have gone to Costco with Hansen and T.A. during that period. Hansen also asserted the evidence refuted Z.A.'s claim that the offense was committed shortly before her tenth birthday, which was at the end of July 2015. He provided Costco records and emails showing Z.A. had not gone to Costco with only Hansen and T.A. during that period. It appears she had gone with Hansen, T.A., and the twins on one occasion and only with Hansen on another occasion. In addition, the letter stated Hansen had taken and passed a polygraph test in October 2020. The polygraph report, which was also provided, stated Hansen had shown no deception when he answered "no" to the questions whether he had ever made Z.A. touch his bare penis and whether he had ever touched her bare bottom.

¶4 The *Trebus* letter also stated that in July 2014, Greg's girlfriend's ten-year-old daughter alleged Greg had molested her. Hansen characterized the allegations as "*strikingly* similar" to Z.A.'s accusations against him. The letter stated that in August 2014, after the allegations against Greg were reported to the Tucson Police Department (TPD), TPD investigators and the Department of Child Safety (DCS) interviewed Z.A., referring to a DCS Report Summary that previously had been disclosed. Hansen summarized the interview, stating Z.A. told the interviewers no one had ever touched her inappropriately. The letter also provided, "while [Z.A.] felt safe around [Hansen], she indicated he was the disciplinarian in the family."

¶5 The letter also documented that a counselor from the Family Center of the Conciliation Court interviewed Z.A. a second time in October 2016, pursuant to a superior court order entered in the custody litigation between Greg and Heather. During that interview, Z.A. said she had known Hansen since she was three. She described Hansen as "more of a stricter parent," particularly with her younger sibling, J.H., adding her "mom told [her] that's probably just because that's his son and he kind of wants him to grow up and be a good man." She stated, "He's not mean or anything like that," but he wants a "good household." She said she could talk to him about "stuff," he is "funny," and she does not think of him as a

stepdad, she thinks of him "as a dad." Although she said he "yells sometimes," she added that her mother had helped him over the years and it had "gotten better for sure. He doesn't yell as much anymore." She said on a scale of one to ten, with ten being the most comfortable, she would give her mother's home, which at that time was also Hansen's home, a ten. She said she had no concerns about living with her mother or about her mother's home.

¶6 The second grand jury proceeding was held in November 2020. Neither the prosecutor nor the testifying detective mentioned the *Trebus* letter. The detective did, however, summarize portions of it. He testified about Z.A.'s forensic interview at the CAC in June 2020. He relayed that, according to Z.A.'s statement during that interview, she, Hansen, and T.A. had returned home from a shopping trip to Costco just before her tenth birthday. Hansen had asked her to come into his bedroom, said it was hot, and told her to take off her clothes. He then grabbed her hand and put it on his penis, "moving her hand and his penis for approximately 15 minutes." Hansen then told her not to tell her mother. T.A. had been the only other person in the house when this occurred. Afterward, Z.A. struggled to enjoy her tenth birthday party because of the incident. The detective also testified that, during the interview, Z.A. had estimated Hansen touched her twenty-five times on the bare back and the buttocks over the next year and a half.

¶7 The prosecutor asked the detective if he had information about when Hansen had gone to Costco in 2015. The detective said he did and that the information showed Hansen had gone to Costco six times between January 1 and July 22, 2015. He explained that there were corresponding emails between Hansen and Heather about trips to Costco and that Hansen had taken Z.A. with him on June 1 and June 15. The detective informed the grand jury that Heather and Hansen separated in June 2017 and were divorced in August 2018 but that Z.A. and Hansen continued to have contact until June 2020, when she alleged he had molested her five years earlier. The detective stated they continued to attend family celebrations together, including the twins' birthday, a celebration of Heather's "work achievements," and other events.

¶8 The detective testified further that he had evidence regarding text messages between Hansen and Z.A. that began in October 2016 and ended on June 4, 2020, which was less than two weeks before Heather reported the alleged molestation to the police. The detective read and summarized messages from June 2019 to June 4, 2020, establishing Hansen

and Z.A. had a continuing relationship.[1]  He also told the grand jury about the custody litigation between Heather and Greg involving Z.A. and T.A. He explained that on October 4, 2016, Z.A. had been interviewed at the Family Center, "which is similar to DCS."  He did not tell the grand jury that the interview had been conducted because Greg's girlfriend's daughter accused Greg of having molested her a year earlier, or that Hansen viewed the allegations as similar to those that Z.A. made against Hansen years later. The detective summarized the interview, noting Z.A.'s positive comments about Hansen, including that he was more like a father than a stepfather, and stated that Z.A. had not disclosed any type of abuse and had not been asked about sexual abuse.

¶9         The prosecutor then asked the detective, "[B]ased on your training and experience, is it uncommon for children to not disclose sexual abuse?"  The detective answered, "It's not uncommon."  He also agreed it is not uncommon for children not to disclose sexual abuse even when they are specifically asked about it.  The prosecutor asked the detective if there is "a difference between a forensic interview at the CAC, as opposed to an interview conducted by say someone with DCS or at the Family Center." Responding that there is, the detective stated that a forensic interview creates "a safe place for children" and that the individuals who conduct the interviews "are trained to do interviews on children."  He further testified that they are "certified professionals," who ask open-ended questions in a "controlled environment that makes the children feel safe when they are talking to an adult."  The prosecutor emphasized the CAC interviewers are specially trained in interviewing children for forensic purposes.  She then asked whether it was correct that "DCS, OCWI, or Family Center people typically are not trained in that way."[2]  The detective responded, "That is correct," also agreeing they do not employ the same standards and techniques as forensic interviewers.  The prosecutor asked the detective

---

[1] The messages the detective read or summarized included the following:  Z.A. wished Hansen a happy Father's Day and each said they loved the other; she asked him for a ride to a party the family was attending; she wished him a happy birthday, told him she loved him, and said she hoped his birthday was special; he texted, "we are hoping to hang out" with her during spring break, suggesting they could go to lunch or for a hike; and, on June 4, 2020, she asked if the family, including the twins, could go to dinner that night, and they exchanged messages about where they would go.

[2] OCWI is the Office of Child Welfare Investigations.

whether, based on his training and experience, it is uncommon for children to genuinely still care about and love their abusers. He responded that it is not uncommon.

¶10 One of the grand jurors asked whether Hansen had "ever apologized, or explained himself, or has he been questioned to determine if this was true, or has he been in any way approached?" The prosecutor interjected that "for legal reasons" she could not specify, she was instructing the detective not to answer. She commented that "[i]t's a good question" with "a lot of different parts," adding, "You can still ask maybe in that area, but the way you worded it just now, I'm not comfortable having him answer for legal reasons." A little later, the same grand juror said he was making "another attempt at [his] question" and asked, "Was the defendant questioned or interviewed?" The detective answered, "No."

¶11 Another grand juror asked about the significance of the information regarding the Costco trips, saying he was confused by it. The prosecutor told the grand jurors they must determine what evidence is relevant and assess credibility, and they should discuss this amongst themselves. After deliberating, the grand jury returned a true bill on an amended indictment that again charged Hansen with molestation of Z.A. but changed the time frame from 2014 to 2015.

¶12 Hansen filed a motion to remand for redetermination of probable cause pursuant to Rule 12.9(a), Ariz. R. Crim. P., citing the constitutions of the United States and Arizona. U.S. Const. amends. V, VI, XIV; Ariz. Const. art. II, §§ 4, 10, 24. He argued the grand jury proceeding was defective in numerous respects, including that the state: (1) had failed to accurately relay all of what Hansen characterized as "clearly exculpatory information contained in the *Trebus* letter"; (2) had failed to explain the significance of the Costco records, including the fact that they established Z.A. did not go to Costco during this period only with Hansen and T.A., and had mischaracterized the records to create the impression that they bolstered rather than undercut Z.A.'s statements; (3) had not told the grand jury that Greg's girlfriend's daughter had accused Greg, Z.A.'s biological father, of molesting her under circumstances similar to those Z.A. had described during the forensic interview; (4) had not told the grand jury Hansen voluntarily took a polygraph test and denied the allegations, the results of which were favorable, and even apart from the polygraph test, had not told the grand jury he had ever made statements denying the accusations; (5) had "undermined the *Trebus* letter" by editorializing improperly, failing to inform the grand jury of the evidence that Hansen and Z.A. had a normal and loving relationship until she accused him of

molesting her, and by stating that DCS and Family Center interviewers lack specialized training to interview children about abuse; and (6) had misled the grand jury by permitting the detective to testify as an expert that children frequently love their abusers without being qualified to render that opinion. Relying primarily on *Maretick v. Jarrett*, 204 Ariz. 194 (2003), *Herrell v. Sargeant*, 189 Ariz. 627 (1997), and *Crimmins v. Superior Court*, 137 Ariz. 39 (1983), Hansen argued the state had not presented the evidence in a fair and impartial manner and had prevented the grand jury from acting independently.

¶13 After a hearing in February 2021, the respondent judge denied the motion. He found "there [were] no substantive procedural rights that were denied" and "no misleading or false information that was presented." He concluded that, given case law establishing polygraph evidence is unreliable for trial, it does not "rise to the level of clearly exculpatory" evidence and is not admissible before the grand jury. Although the respondent judge found some of the other evidence in the *Trebus* letter "very strong impeachment evidence for trial," he concluded it is not clearly exculpatory. This special action followed.

## Special-Action Jurisdiction

¶14 A challenge to a trial court's ruling on a Rule 12.9 motion must be sought by special action. *Francis v. Sanders*, 222 Ariz. 423, ¶ 9 (App. 2009); *see also State v. Murray*, 184 Ariz. 9, 32 (1995). Hansen does not have an equally plain, speedy, and adequate remedy by appeal. Ariz. R. P. Spec. Act. 1(a); *State ex rel. Romley v. Superior Court*, 172 Ariz. 109, 111 (App. 1992). Moreover, the admissibility of polygraph evidence at a grand jury proceeding is a matter of first impression, involves a question of law, and is likely to arise again. *See Francis*, 222 Ariz. 423, ¶ 9; *Luis A. v. Bayham-Lesselyong*, 197 Ariz. 451, ¶ 2 (App. 2000). For these reasons we accept jurisdiction of this special action.

## Polygraph Evidence

¶15 A grand jury's finding of probable cause can be challenged if the defendant was denied a substantial procedural right. *Maretick*, 204 Ariz. 194, ¶ 11; *see also* Ariz. R. Crim. P. 12.9(a) (defendant may challenge grand jury proceeding by filing motion alleging defendant "was denied a substantial procedural right"). These rights include the right to a fair and impartial presentation of the evidence. *Crimmins*, 137 Ariz. at 41. In addition, due process requires the state to inform the grand jury of the existence of clearly exculpatory evidence, *Trebus*, 189 Ariz. at 625, which is

evidence that "would deter the grand jury from finding the existence of probable cause," *Herrell*, 189 Ariz. at 631 (quoting *State v. Superior Court (Mauro)*, 139 Ariz. 422, 425 (1984)).

**¶16** This court reviews a trial court's denial of a motion to remand an indictment to the grand jury for an abuse of discretion. *Francis*, 222 Ariz. 423, ¶ 10. When the trial court commits an error of law in making a discretionary decision, however, the court "may be regarded as having abused [its] discretion." *Id.*

**¶17** Hansen summarized the results of the October 2020 polygraph test in the *Trebus* letter and included the report among the documents supporting the letter. Neither the prosecutor nor the detective mentioned it during the grand jury hearing in November. Hansen contends the respondent judge erred by finding that, because polygraph evidence is inadmissible at trial, it is also per se inadmissible in a grand jury proceeding. He also challenges the respondent's related determination that such evidence is not clearly exculpatory and, therefore, the state did not have a duty to present it.

**¶18** It is well settled in Arizona that polygraph evidence is unreliable and, absent a stipulation by the parties, categorically inadmissible at trial "for any purpose." *State v. Hoskins*, 199 Ariz. 127, ¶ 69 (2000); *see also State v. Ikirt*, 160 Ariz. 113, 115 (1987) (explaining polygraph evidence inadmissible "because it is unreliable and the trier of fact has a tendency to treat such evidence as conclusive on the issue of guilt"); *State v. Bowen*, 104 Ariz. 138, 141 (1969) (finding evidence of or reference to polygraph test inadmissible). In *State v. Perez*, 233 Ariz. 38, ¶¶ 16-18 (App. 2013), this court addressed whether polygraph evidence remained per se inadmissible at trial as provided by these authorities after our supreme court amended Rule 702, Ariz. R. Evid., effective January 1, 2012, and adopted the *Daubert* standard[3] for determining the admissibility of expert testimony. *See* Ariz. R. Evid. 702 cmt. There, we observed that the defendant had neither argued nor presented any evidence establishing there had been a change in "polygraph technology or circumstance between *Hoskins* and this case that would justify a change in Arizona's rule." *Perez*, 233 Ariz. 38, ¶ 18. We concluded that polygraph tests continue to be "unreliable and admission of their results risks usurping the role of the jury," deficiencies that make such evidence inadmissible under *Daubert*. *Id.*

---

[3]*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *see also* Fed. R. Evid. 702.

Consequently, we stated we would "continue to apply the longstanding Arizona rule that the results of polygraph tests are per se inadmissible." *Id.*

¶19      Hansen concedes polygraph evidence is inadmissible at trial, but he argues that this does not automatically preclude the introduction of such evidence in a grand jury proceeding. Citing *Maretick*, 204 Ariz. 194, ¶ 9, and *State v. Fulminante*, 193 Ariz. 485, ¶ 11 (1999), he maintains that grand jury proceedings are different. He asserts the rules of evidence do not apply and evidence that may be inadmissible at trial may nevertheless be admissible before the grand jury. Hansen contends the respondent judge erred therefore by finding the evidence per se inadmissible. And, he argues, the respondent also erred when he made the related finding that polygraph evidence does not "rise to the level of clearly exculpatory evidence," which the state must present to a grand jury.

¶20      Hansen is correct that generally, "[e]vidence . . . need not be admissible in trial" to be admissible in a grand jury proceeding. *Fulminante*, 193 Ariz. 485, ¶ 11 (finding no error in use in grand jury hearing of confession found involuntary and inadmissible on appeal from initial conviction); *see also Franzi v. Superior Court*, 139 Ariz. 556, 566 (1984) ("hearsay evidence in a grand jury proceeding is not objectionable"). As he also correctly points out, the rules of evidence, other than rules pertaining to privilege, do not apply to grand jury proceedings and the grand jury is entitled to hear all relevant, non-protected evidence that has a bearing on a given case. *See* Ariz. R. Evid. 1101(d); *see also Maretick*, 204 Ariz. 194, ¶ 9. But as our jurisprudence has emphasized, jurors might mistakenly give polygraph evidence the deference and weight afforded to scientific or expert-based fact. As our supreme court observed in *Ikirt*, 160 Ariz. at 115, such evidence is unreliable yet the "trier of fact has a tendency to treat such evidence as conclusive on the issue of guilt." Reiterating that concern in *Perez*, 233 Ariz. 38, ¶ 18, this court stated the admission of polygraph evidence risks "usurping the role of the jury" to consider the totality of evidence bearing on veracity. Those same concerns apply to a grand jury proceeding.

¶21      Moreover, we disagree with Hansen that such evidence is clearly exculpatory when favorable to the defendant, obligating the state to present it to the grand jury. *See Francis*, 222 Ariz. 423, ¶ 12 (prosecutor must present all "clearly exculpatory" evidence to grand jury). As we previously stated, evidence is clearly exculpatory if it "would deter the grand jury from finding the existence of probable cause." *Herrell*, 189 Ariz. at 631 (quoting *Mauro*, 139 Ariz. at 425). We hold that a species of evidence our courts have deemed both unreliable and persuasive cannot be sufficient to deter a grand

jury from finding probable cause, just as the state should not be permitted to use such evidence to establish it. We are not alone in so holding. The majority of states do not permit polygraph evidence to be introduced to grand juries.[4] Nor do we find the few contrary cases persuasive.

**¶22** Hansen cites cases from New Mexico and Michigan, as well as four older federal district court cases, for the proposition that polygraph evidence should be admissible at grand jury proceedings. *See State v. Blue*, 965 P.2d 945, ¶ 7 (N.M. Ct. App. 1998); *People v. Hoffman*, 518 N.W.2d 817, 828 (Mich. Ct. App. 1994); *In re Grand Jury Investigation*, 791 F. Supp. 192, 194 (S.D. Ohio 1992); *United States v. Roberts*, 481 F. Supp. 1385, 1389-90 (C.D. Cal. 1980); *United States v. Callahan*, 442 F. Supp. 1213, 1218 (D. Minn. 1978); *United States v. Narciso*, 446 F. Supp. 252, 297-98 (E.D. Mich. 1977). But we cannot credit the reasoning of these cases given Arizona's own jurisprudence finding such evidence both unreliable and unduly persuasive. *See supra* ¶ 18. Furthermore, the extra-jurisdictional cases cited by Hansen are readily distinguishable by procedural posture or by markedly different attitudes regarding the reliability of polygraph evidence.[5]

---

[4]*See, e.g.*, *Coleman v. State*, 553 P.2d 40, 49 (Alaska 1976) (disapproving of state's reference at grand jury proceeding to evidence that would have been inadmissible at trial, including polygraph examination results); *State v. Hansen*, 215 N.W.2d 249, 250-53 (Iowa 1974) (holding it was improper for state to bolster witness's credibility by informing grand jury he had passed polygraph test); *State v. Martin*, 823 N.W.2d 913, 925 (Minn. 2012) (holding polygraph evidence generally inadmissible at grand jury proceedings); *People v. Ricigliano*, 526 N.Y.S.2d 565, 566 (N.Y. App. Div. 1988) (finding no error in failure to submit polygraph evidence to grand jury because it is not competent evidence); *State v. Spencer*, 783 A.2d 413, 418 (R.I. 2001) (finding it was "inappropriate and prejudicial" to inform grand jury that defendant failed voice stress analyzer test, which is "akin to polygraph tests," because such tests purport to determine truth of a statement and are inadmissible at trial, but finding error insufficient to warrant dismissal of indictment because "otherwise competent evidence" established probable cause); *State v. Thrift*, 440 S.E.2d 341, 352 (S.C. 1994) (holding polygraph evidence, including evidence that individual refused to take test, inadmissible before grand jury).

[5]*See, e.g.*, *Narciso*, 446 F. Supp. at 298 & n.3 (where grand jurors "had the benefit of live testimony by two polygraph experts" who bolstered other witnesses' testimony and one grand juror stated polygraph evidence was

**Violation of *Trebus* and Unfair Presentation of the Case**

**¶23** During a grand jury's investigation, criminal defendants are afforded substantial procedural rights and the right to due process, which includes the right to a fair and impartial presentation of the evidence. *Crimmins*, 137 Ariz. at 41; *see also* Ariz. R. Crim. P. 12.9(a). "The duties of fair play and impartiality imposed on those who attend and serve the grand jury are meant to ensure that the determinations made by that body are informed, objective and just." *Crimmins*, 137 Ariz. at 41. Consequently, the state has a duty to properly instruct the grand jury on the law, *Cespedes v. Lee*, 243 Ariz. 46, ¶ 9 (2017), to present the evidence in a manner that is fair and impartial, and to introduce clearly exculpatory evidence, *Bashir v. Pineda*, 226 Ariz. 351, ¶¶ 10-13 (App. 2011). *See also Trebus*, 189 Ariz. at 625 (due process requires state to inform grand jury of clearly exculpatory evidence). What constitutes a fair presentation of the evidence will "vary from case to case." *Trebus*, 189 Ariz. at 626 (quoting *Mauro*, 139 Ariz. at 424).

**¶24** Section 21-412, A.R.S., provides, in relevant part, that the grand jury is not required to hear evidence "at the request of the person

---

not dispositive of finding probable cause, court avoided ultimate determination of whether admission of polygraph evidence to grand jury is proper but found in any event defendants were neither prejudiced nor deprived of rights requiring dismissal of indictments); *Callahan*, 442 F. Supp. at 1218-19 (concluding, on appeal after conviction, that prosecutor's statement to grand jury that defendant had failed polygraph test did not taint indictment warranting dismissal, given heavy burden to overcome presumption that "indictment regular on its face . . . is presumed to be founded on competent evidence" and existence of independent, competent evidence to support finding of probable cause); *Blue*, 965 P.2d 945, ¶¶ 3-4, 15-17 (noting polygraph evidence may "directly negate" guilt and constitute exculpatory evidence for purposes of grand jury presentation and motion to quash indictment under test prescribed by *State v. Hewitt*, 769 P.2d 92 (N.M. Ct. App. 1988), but only if evidence would be admissible at trial, which is conditioned upon compliance with Rule 11-707, N.M. R. Evid., which provides minimum qualifications for polygraph examiners and requirements for admissibility of polygraph evidence at trial); *see also Lee v. Martinez*, 96 P.3d 291, ¶ 4 (N.M. 2004) (rejecting state's request to repeal Rule 11-707, N.M. R. Evid., finding polygraph evidence sufficiently reliable to be per se admissible scientific evidence, without *Daubert* hearing in all cases, provided expert is qualified under and examination was conducted in accordance with Rule 11-707).

under investigation, but may do so." The statute obligates grand jurors to "weigh all the evidence" they receive, "and when they have reasonable ground to believe that other evidence, which is available, will explain away the contemplated charge, they may require the evidence to be produced." *Id.* Relying in part on *Crimmins*, 137 Ariz. at 43-44, our supreme court stated in *Trebus* that this statute, combined with Rule 12.6, Ariz. R. Crim. P., and a defendant's right to due process, not only require the state to present clearly exculpatory evidence, they also require the state to inform the grand jury that a defendant has asked to appear or has submitted "possible exculpatory evidence." 189 Ariz. at 623-24. It is for the grand jury, not the state, to decide whether to grant or deny the defendant's request. *Id.* at 625 (citing *State v. Just*, 138 Ariz. 534, 540 (App. 1983)). The court specifically held:

> Given the power of the prosecutor in the grand jury system, the statutory right of the grand jury to decide whether to hear evidence from the defendant, and the defendant's right to request appearance before the grand jury . . . [the prosecutor] must inform the grand jury that the defendant has requested to appear or has submitted exculpatory evidence. Without such a responsibility, A.R.S. § 21-412 and Rule 12.6 are rendered meaningless.

*Id.* at 625. Thus, when a defendant has asked to present evidence, the grand jury may either grant or deny the request. *Id.* "The statute does not authorize the [state] to present a third option of summarizing the defense evidence from [its] point of view." *Just*, 138 Ariz. at 540; *see also Reyes v. Cohen*, No. 1 CA-SA 20-0109, ¶ 10, 2021 WL 3732578 (Ariz. Ct. App. Aug. 24, 2021) (state has duty to provide grand jury fair and impartial presentation of evidence, instructions on applicable law, and information on existence and content of *Trebus* letter).

¶25 In order to trigger the state's obligations, the letter to the prosecutor must be sufficiently specific and must identify the evidence that might deter the grand jury from finding probable cause to believe an offense was committed and the accused committed it. *Trebus*, 189 Ariz. at 625-26 (citing *Mauro*, 139 Ariz. at 425). Because the defendant's letter in *Trebus* was vague and related to the alleged victim's "veracity and credibility," highlighting inconsistencies in her various allegations, the court affirmed the trial court's denial of the defendant's Rule 12.9 motion. *Id.* The court emphasized that the grand jury is only required to determine

whether probable cause exists to believe the person being investigated committed a crime; it "is not the place to try a case." *Id.* at 625.

¶26         Hansen contends the state violated his "substantive due process rights" in three respects:  it interfered with the grand jury's broad investigative powers under § 21-412; it did not honor his request to present exculpatory evidence; and it presented misleading testimony through the detective, which it did not correct.  Hansen asserts that although the prosecutor presented some of the information outlined in his letter, "she withheld critical details in order to make it appear more favorable to the State than it actually was" and "undermined through improper editorialization" those portions she did relay to the grand jury.  Although Hansen primarily argues that the grand jury process was flawed because the state failed to present the results of the polygraph examination, an argument we have rejected, he also contends the prosecutor injected error by failing to inform the grand jury of the *Trebus* letter and by not telling the grand jury that he had been asked about the allegations and had denied them.  Relying on *Maretick*, he contends "the prosecutor interposed herself in the grand jury's inquiry and prevented the grand jury from acting independently," resulting in a "fundamentally flawed presentment."

¶27         The letter from Hansen through his counsel to the prosecutor made clear his defense that he did not commit the offense.  The letter referred to specific evidence he claimed was exculpatory and included nearly two hundred and forty pages of supporting documentation.  This was sufficiently specific and clear to trigger the state's duty under *Trebus* and § 21-412 to inform the grand jury of the letter and convey the "possible exculpatory" information summarized in it.  *Trebus*, 189 Ariz. at 624; *see also Bashir*, 226 Ariz. 351, ¶ 10 (construing *Trebus* to require that if letter is sufficiently detailed regarding proposed evidence, prosecutor has duty to convey information to grand jury).  That presentation would have allowed the grand jury to exercise its independent judgment and request the evidence if it so desired.  *Trebus*, 189 Ariz. at 625.

¶28         It is undisputed that neither the prosecutor nor the detective told the grand jury Hansen had provided the prosecutor with a letter.  This was error under *Trebus* and its progeny.  And, although the prosecutor summarized portions of the information in the letter, we cannot agree that this constituted a fair and impartial presentation of the evidence given the manner in which she characterized the potentially exculpatory information

and what she chose to withhold.[6] We must therefore determine whether that error was harmless. *See Maretick*, 204 Ariz. 194, ¶ 15; *see also Bashir*, 226 Ariz. 351, ¶ 18. The error is harmless only if we are "confident beyond a reasonable doubt that the error had no influence on the jury's judgment." *Maretick*, 204 Ariz. 194, ¶ 15.

**¶29**   At least one grand juror considered it important to the probable cause determination whether Hansen had made any statements in response to the allegations, offered an explanation, or apologized.[7] And although the grand jury properly was not informed about the polygraph test results, it was misleading and, in fact, untrue for the detective to have responded "no" when the grand juror asked him if Hansen had made any statements. Hansen asserts that "at a minimum, the State was obligated to

---

  [6]The state concedes in its response to the special-action petition that, "[g]iven the state of the law at the time of the presentation and the time of the denial [of the Rule 12.9 motion], coupled with" this court's recent decision in *Trinh v. Garcia*, 251 Ariz. 147 (App. 2021), "it may well have been error for the trial court to deny the remand motion, and the prosecutor should have told the grand jury about the letter," adding that "neither requirement was absolutely clear in November of 2020 or February of this year." In *Trinh*, which Hansen relies on in his reply to the state's response, this court found the grand jury proceeding flawed because the prosecutor had failed to inform the grand jury about the defendant's *Trebus* letter. *Id.* ¶¶ 5-6, 19, 27. Although the error, which deprived the grand jury of its independence under § 21-412, was harmless, it was error nevertheless. *Id.* ¶¶ 1, 27, 32-36. After the briefing was completed in this special action and following oral argument before this court, our supreme court denied the defendant's petition for review in *Trinh* but ordered the opinion depublished. *Trinh v. Garcia*, No. CR-21-0171-PR (Ariz. Aug. 24, 2021) (order). Consequently, *Trinh* is neither precedential nor persuasive authority. *See* Ariz. R. Sup. Ct. 111(c)(1)(C) (memorandum decisions "are not precedential" and may not be cited for persuasive value if "a depublished opinion").

  [7]The state suggested during oral argument before this court that the prosecutor may have been concerned about Hansen's constitutional rights, presumably referring to his Fifth Amendment right not to make any statements. But that right, clearly applicable in grand jury proceedings, *see Maretick*, 204 Ariz. 194, ¶¶ 14, 16, was not implicated here. Hansen did not remain silent. He vigorously denied the allegations both in the context of the polygraph examination and in the *Trebus* letter.

tell the grand jury that Hansen had denied abusing Z.A. without mentioning the polygraph examination itself." We agree. In a case anchored entirely on the credibility of the statements of the alleged victim, and as the grand juror's question reflects, Hansen's denial was crucial. The detective's testimony and the prosecutor's failure to correct it compounded the error under *Trebus*.

¶30 In this respect, this case is similar to *Maretick*. There, the defendant, who had lost control of his car, resulting in an accident that killed his wife, was charged with manslaughter. 204 Ariz. 194, ¶¶ 1-2. The defendant was unconscious at the scene of the accident and sustained serious brain injuries and permanent cognitive deficits, including short-term memory loss. *Id.* ¶ 3. He was never able to provide investigators with a statement about the accident. *Id.* The state's only witness before the grand jury, a detective, testified erroneously that the defendant had made a full recovery from his injuries. *Id.* ¶ 4. In addition, the prosecutor interfered with a grand juror's questioning of the detective about whether the defendant had made any statements regarding what had happened. *Id.*

¶31 Our supreme court found the detective had mislead the grand jury by stating he was fully recovered when the detective knew that was not the case and that the defendant was never able to recall the accident. *Id.* ¶ 13. The court stated that, although this misrepresentation alone was not enough to require a remand, "the prosecutor assisted in misdirecting the grand jury" by not correcting the misstatement. *Id.* ¶ 14. It further observed that the prosecutor had "intercepted and deflected" questions from a grand juror, preventing the detective from answering whether the defendant had spoken to the detective and whether he had made any statements. *Id.* ¶¶ 4, 16. The court concluded it could not find the errors harmless beyond a reasonable doubt because, together, they resulted in a presentation of the case that was less than fair and impartial. *Id.* ¶ 16.

¶32 We also find *Crimmins*, which our supreme court relied on in *Maretick*, 204 Ariz. 194, ¶¶ 12-14, instructive here. There, the defendant asserted the state had not given him the opportunity to provide his version of the facts, rebutting charges of kidnapping and assault, despite his having requested to do so in a letter. *Crimmins*, 137 Ariz. at 40-41. The defendant claimed he had detained and questioned a juvenile he believed had entered his home and had stolen property. *Id.* at 41. Our supreme court found that, based on the defendant's phone call to the police, it was apparent he believed he had made a citizen's arrest. *Id.* at 42. The investigating detective testified before the grand jury, however, that he had no evidence suggesting the juvenile had been involved in the burglary, despite that

juvenile's presence with the others implicated on the day of the burglary. *Id.* Our supreme court found that the detective's "inaccurate" testimony, together with the prosecutor's failure to instruct the grand jury on the citizen's arrest statutes, "rendered the presentation of this case less than fair and impartial," denied the defendant due process, and required a new determination of probable cause. *Id.* at 42-43.

¶33 Similarly, in *Herrell*, decided at the same time as *Trebus*, the defendant challenged the trial court's denial of his second Rule 12.9 motion on a charge of aggravated assault based on his having pursued a vehicle while brandishing a gun. 189 Ariz. at 628-29. Reversing, our supreme court concluded the state had failed to give the grand jury an "accurate picture of the substantive facts" because it only presented the facts from the perspective of the alleged victims. *Id.* at 629, 631. It did not, as the defendant had requested, present evidence showing the offense was justified because he was attempting to prevent harm to his daughter. *Id.* at 628-31. Finding the case indistinguishable from *Crimmins*, the court concluded the grand jury was not given the relevant and "apparently uncontradicted facts" that would have warranted a justification instruction under A.R.S. § 13-411. *Id.* at 630. The court determined that the state's failure to provide the grand jury with an accurate picture of the substantive facts had denied the defendant his right to due process and a fair and impartial presentation of the evidence. *Id.* at 631.

¶34 In this case, as in *Maretick*, *Crimmins*, and *Herrell*, the state's presentation of the evidence compounded its erroneous failure to alert the grand jury to Hansen's *Trebus* letter. First, as discussed, it incorrectly suggested that Hansen had never made statements denying the allegations. Further, the prosecutor mischaracterized evidence regarding the documentation of trips Hansen had made to Costco. The detective summarized some of that evidence, but the record shows he did so in a manner that suggested the information supported rather than refuted Z.A.'s allegations.

¶35 Notably, at least one grand juror found the Costco evidence confusing and asked the prosecutor for guidance. He asked why the grand jury was "hearing about the trips to Costco and corresponding emails and texts," and asked whether they related to the alleged molestation. The prosecutor provided little guidance, telling the grand juror it was a "great question," one that would be "good . . . to bring up during . . . deliberations." She then correctly explained that the grand jurors are the judges of credibility and that, as the body that determines the facts, they must decide what is relevant and what is not. Ultimately, however, when

the grand juror persisted and asked whether "the trips to Costco [were] to establish days of contact between the victim and the defendant," the prosecutor responded, "Possibly."

¶36        Notwithstanding her apparent attempt to resist commenting on the evidence, the prosecutor's response in the context of this exchange suggested to the grand jury that, if relevant, the evidence possibly corroborated the charge.  She never stated or suggested the evidence could possibly refute it.  In the *Trebus* letter, however, Hansen had asked the prosecutor to present the "clearly exculpatory" evidence to the grand jury, explaining that it showed the offense could not have been committed in 2014 as alleged in the initial indictment.  Indeed, the state conceded the offense could not have been committed during that period as Z.A. had originally alleged — and amended the time frame in the second indictment to 2015.

¶37        The letter also summarized proffered evidence refuting Z.A.'s claim that she had gone to Costco with Hansen and T.A. only and that T.A. was the only other person in the house when Hansen allegedly molested her.  Hansen claimed the evidence showed she had gone to Costco during this time with Hansen, T.A., and the twins.  The absence of any reference to the *Trebus* letter, together with the prosecutor's comment that the evidence "possibly" established Hansen had access to Z.A. during this time, deflected the grand jury from viewing the evidence as exculpatory.

¶38        In addition, the prosecutor failed to give the grand jury important context to the 2014 and 2016 interviews of Z.A.  The state did not make clear the interviews were prompted by the allegations against Greg by his girlfriend's daughter.  Nor did the detective explain that the allegations against Greg by another child, who Z.A. knew, were remarkably similar to the allegations Z.A. later made against Hansen.

¶39        In addition, the prosecutor undermined Hansen's proffered evidence.  For example, with respect to Z.A.'s interview at the Family Center in October 2016, wherein she made no allegations against Hansen and described a high level of comfort with him, the prosecutor elicited testimony from the detective that, based on his "experience," which was never established, it is not uncommon for children not to disclose sexual abuse.  She also elicited from the detective testimony that DCS and Family Center interviewers are not as well trained for interviewing children about sexual abuse as forensic interviewers at the CAC.  He stated the CAC is "a safe place for children," suggesting, without any basis, that interviewers for DCS and the Family Center are not able to create a similarly "safe place."

He testified further that forensic interviewers ask "open-ended questions" in a "controlled environment," suggesting, without establishing, that the 2016 interview of Z.A. was not conducted in this manner. The prosecutor also elicited from the detective, again without any apparent basis, the generalization that "DCS, OCWI, or Family Center people typically are not trained in that way" and do not "necessarily employ the same standards and techniques" as the forensic interviewers.

**¶40** Although it would have been proper for the detective to have relied on the hearsay opinion of an expert on these topics as a basis for his opinions, that is not what occurred here. *See Korzep v. Superior Court*, 155 Ariz. 303, 305-06 (App. 1987) (finding it generally proper for police officer to present pathologist's opinion through hearsay testimony, but finding remand to grand jury necessary due to officer's mischaracterization of pathologist's opinions and speculations as lay person of additional opinions pathologist might hold in responding to grand jurors' questions). The detective gave the impression that he is specially qualified or has expertise in the area of child sexual abuse, without any basis for suggesting such expertise. Nor is it clear on what basis he suggested to the grand jury that a forensic interview should be given greater weight than interviews by DCS specialists or family court counselors. *Cf. Escobar v. Superior Court*, 155 Ariz. 298, 300-02 (App. 1987) (finding reversible error under *Crimmins* based on detective's ambiguous and "probably incorrect" characterization of severity of child victim's injuries and prosecutor's determination, rather than grand jury's, of victim's competency to testify).[8]

**¶41** As this court recognized in *Just*, the purpose of § 21-412 is to "give the grand jury the opportunity to hear the evidence it deems necessary to make its probable cause determination." 138 Ariz. at 540. It is

---

[8]The record also suggests the prosecutor attempted to undermine the evidence that demonstrated Z.A. and Hansen had a positive, warm relationship, even after the offense allegedly occurred. The prosecutor elicited testimony from the detective that, again based on his "experience," it is common for victims of sexual abuse to "still care about and love their abuser." Coupled with the comments intended to undermine the 2016 Family Center interview, this appears to have been an overall attempt to sway the grand jury. *See Maretick*, 204 Ariz. 194, ¶ 10 (prosecutor must not unduly or unfairly influence grand jury and must allow it to act independently); *see also State v. Good*, 10 Ariz. App. 556, 558 (1969) (prosecutor must not act so as to invade province of grand jury or influence its action).

intended to preserve the independence of the grand jury and does not permit the prosecutor to summarize the defendant's evidence from the prosecutor's "own point of view." *Id.*

**Conclusion and Disposition**

**¶42** It does not appear the state has any evidence independent of Z.A.'s statements to support the charge. It was therefore crucial that the prosecutor tell the grand jury about the *Trebus* letter, that Hansen had denied committing the offense, and that he had proffered evidence supporting his version of the facts. *See Herrell*, 189 Ariz. at 630 (finding, under "unique facts" of that case, "it should have been apparent to the deputy county attorney presenting the case" fair and impartial presentation required informing grand jury of defendant's "version of the relevant, substantive facts"). Further, the prosecutor persistently diminished and mischaracterized evidence that challenged the credibility of the alleged victim's accusations.

**¶43** We emphasize that the state is not required to make the defendant's case at a grand jury proceeding and is not required to introduce all potentially exculpatory evidence. *See Bashir*, 226 Ariz. 351, ¶ 15. And we reiterate that the grand jury proceeding is not a "mini trial." *See United States v. Dionisio*, 410 U.S. 1, 17 (1973). "[I]ssues such as witness credibility and factual inconsistencies are ordinarily for trial." *Trebus*, 189 Ariz. at 625; *see also Bashir*, 226 Ariz. 351, ¶¶ 13, 15. But when, as here, credibility is everything and there is no independent evidence to support a finding of probable cause, the state's one-sided presentation of evidence relating to the accuracy of the victim's statements, despite known, contrary evidence, undermines our supreme court's command that grand jury determinations must be "informed, objective and just." *Crimmins*, 137 Ariz. at 41.

**¶44** Cumulatively, the state's presentation of its case here was not fair and impartial. Hansen has established the violation of a substantial right, *Maretick*, 204 Ariz. 194, ¶ 19; Ariz. R. Crim. P. 12.9(a), and we cannot say beyond a reasonable doubt that the errors did not influence the grand jury's determination of probable cause to believe Hansen committed the offense of child molestation.

**¶45** For the reasons stated, we accept jurisdiction of this special action and, finding the respondent judge abused his discretion, we reverse his denial of Hansen's motion to remand this matter to the grand jury.